## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**CASE NO. 05-11158MLW**

| | | |
|---|---|---|
| **COMCAST OF MASSACHUSETTS  I, INC.** | ) | |
| **("COMCAST"),** | ) | |
| **Plaintiff** | ) | **DEFENDANT'S FIRST** |
| | ) | **AMENDED MEMORANDUM** |
| **v.** | ) | **OF LAW IN SUPPORT OF HIS** |
| | ) | **MOTION TO DISMISS** |
| **AVERILL MORAN,** | ) | **PLAINTIFF'S COUNT I** |
| **Defendant** | ) | **(VIOLATION 47 U.S.C. § 553)** |

### I. BACKGROUND

The present action is based upon Plaintiff's allegation that Defendant descrambled and intercepted its cable television signals in violation of Title 47 U.S.C. § 553. Plaintiff's complaint contains two counts, the first, violation of 47 U.S.C. § 553, and its second, the common law claim of conversion. Defendant's first responsive pleading to Plaintiff's COUNT I alleging violation of 47 U.S.C. § 553 is his present motion pursuant to Fed. R. Civ. Proc. 12(b)(6) where Plaintiff has failed to state a claim upon which relief can be granted. Plaintiff's basis for this affirmative defense is the expiration of the statute limitations for COUNT I as discussed below.

### II. PARTIES

Plaintiff is Comcast of Massachusetts I, Inc. (hereinafter "Plaintiff" or "Comcast"), having a place of business at 6 Campanelli Drive, Andover, Essex County, Massachusetts.

Defendant is Averill Moran, an individual having a residential address of 95 Pitman Street, Methuen, Essex County, Massachusetts.

## III. ISSUE AT LAW

**Whether Plaintiff's COUNT I alleging a violation of 47 U.S.C. § 553 is time barred pursuant to the applicable statute of limitations, 47 U.S. C. 415(a).**

## IV. ARGUMENT

**Whether Plaintiff's COUNT I alleging violation of 47 U.S.C. § 553 must fail since it is time barred pursuant to the applicable statute of limitations.**

1. **Plaintiff did not file its complaint until almost three years after the time it alleges Defendant received its scrambled programming.**

   On June 13, 2005, Defendant was served Plaintiff's complaint alleging violation of 47 U.S.C. § 553 and common law conversion. Defendant refers to and incorporates by reference Plaintiff's complaint (attached hereto as EXHIBIT 1).

   Paragraph 13 of Plaintiff's complaint states "On information and belief, on or before June 14, 2002, the Defendant or some third party modified one (1) certain converters /descramblers, without Comcast's authorization, thereby creating a descrambling devise(s)." On its face, Plaintiff's complaint alleges modifications of its cable box approximately three (3) years ago. Although not germane to the present motion, Defendant vehemently denies this allegation. Defendant states that, upon information and belief, he returned a cable box to Comcast as defective on or before June 14, 2002.

   The applicable statute of limitations for claims filed pursuant to 47 U.S.C. § 553, 47 U.S.C. § 415 (a) (recovery of charges by carrier) states "All actions at law by carriers for their lawful charges, or any part thereof, shall begin within two years from the time the action accrues, and not after."

Plaintiff's Complaint should have been filed on or before June 15, 2004. Its failure to file until June 3, 2004, nearly one year after the statue of limitations expired, is fatal to this cause of action.

Accordingly, Plaintiff's COUNT I must be dismissed, with prejudice.

2.    **Standard of Review – Fed. R. Civ. Proc. 12(b)(6)**

The standard of review for a motion pursuant to Fed. R. Civ. Proc. 12(b)(6) is ". . . the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, . . .." [Fed. R. Civ. Proc. 12(b)]

In CSC HOLDINGS, INC. v. J.R.C. PRODUCTS, INC., ET AL., 78 F. Supp. 2d 794 (1999) (attached hereto as EXHIBIT 2), the Court reiterated the standard for summary judgment, in a case of alleged cable piracy, stating in pertinent part, "Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); CINCINNATI INS. CO. v. FLANDERS ELEC. MOTOR SERV., INC., 40 F.3d 146, 150 (7TH Cir. 1994). A genuine issue for trial exists only when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. ANDERSON v. LIBERTY LOBBY, INC., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must view all evidence in a light most favorable to the nonmoving party, and draw all reasonable inferences from the evidence in the nonmovant's favor. CINCINNATI INS., 40 F.3d at 150. However, if the evidence is merely colorable, or is not significantly probative, or merely raises some metaphysical doubt as to the material facts, summary judgment may be granted. LIBERTY LOBBY, 477 U.S. at 261, 106 S.Ct. 2505; MATSUSHITA ELEC. INDUS. CO. v. ZENITH RADIO CORP., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a

judge deciding a motion for summary judgment. LIBERTY LOBBY, 477 U.S. at 255, 106 S.Ct. 2505."

The question then becomes whether, in a light most favorable to Plaintiff, dismissal of Plaintiff's count alleging violation of 47 U.S.C. § 553 is appropriate.

In C.S.C. HOLDINGS, INC., supra, the Court addressed the statute of limitations issue in which the Defendants asserted a two year limitation period pursuant to 47 U.S.C. § 415(a). In that case, the Court rejected this affirmative defense since there was indisputable evidence that there had been a series of ongoing violations that tolled the statute. Additionally, the Court found that there was sufficient evidence to conclude that the Defendants had actively attempted to conceal their offending activities. In the present matter, there is no evidence that there was any attempt by Mr. Moran to conceal anything.

The present matter compares relevantly with CSC HOLDINGS, INC., supra, in that 47 U.S.C. § 415 is the appropriate statute of limitations – two years. This case then contrasts favorably for the Defendant in the present matter. First, it is indisputable that Comcast was in possession of Mr. Moran's allegedly altered cable box on or before June 14, 2002 (EXHIBIT 1, at PP 13, Plaintiff's Complaint). Second, it is also indisputable that Comcast filed its complaint nearly a year after the statute of limitations had passed, even under a light most favorable to Comcast. The contrast lies in the issue of tolling the limitations period, where in CSC HOLDINGS, INC., supra, there was clear evidence that the defendants attempted to conceal their illicit activities, however there is no such evidence presently.

In the Rule 56 context, there are no genuine issues of material fact in dispute as to the term of the statute, the date of the alleged malfeasance and the date Comcast's complaint was filed.

Accordingly, Defendant's Motion To Dismiss COUNT I of Plaintiff's Complaint must be ALLOWED.

The analysis now turns to when the statute of limitations begins to run and whether Plaintiff has a cognizable argument for other wise tolling the statute.

**3. The statute of limitations began to run No later than June 14, 2002 and thereafter any action pursuant to 47 U.S.C. § 553 is time barred as of June 15, 2004.**

The legislative intent of the two year statute of limitations imposed by 47 U.S.C. § 415 (a) is ". . . to fix one date on which all causes of action, . . ., should be deemed to have accrued (citing the Interstate Commerce Act § 16(3), 49 U.D.S. (1976 Ed) § 16(3) [this statute was later replaced by 49 U.S.C. § 11706 (1982)].

A case on point regarding the determination of the effective date for the running of 49 U.S.C. § 415(a) is <u>MCI TELECOMMUNICATIONS CORPORATION v. TELECONCEPTS, INCORPORATED V. BELL OF PENNSYLVANIA</u>, 71 F.3d 1086 (1995) which stated in pertinent part "The period fixed by a statute of limitations begins to run from the 'accrual of the cause of action.'" Supra at 1101, citing 4A Corbin, Corbin On Contracts § 951 (1951).

In the present matter, it is indisputable that Plaintiff claims the alleged acts of Defendant occurred ". . . on or before 6/14/2002. . .." Accordingly, by its own admissions, and in a light most favorable to Plaintiff, the alleged offenses( which are denied) occurred about three years prior to its complaint filing date on June 3, 2005.

Therefore Plaintiff's COUNT I alleging violations of 47 U.S.C. § 553 must, as a matter of law, be DISMISSED, with prejudice.

**4. There is no reasonable argument Plaintiff can proffer in support of tolling the two year statute of limitations.**

The issue of the when a Plaintiff discovers or should discover an alleged injury was refined and addressed in <u>MCI TELECOMMUNICATIONS CORPORATION</u>, supra, where it opined that a reasonable interpretation of 47 U.S.C.A. § 206, 415 (b) should be in a case of alleged telecommunications interception, the "discovery of injury rule" as opposed to the "date of injury rule." However this rule imposes upon the plaintiff a standard of due diligence, stating ". . . a cause of action accrues only when the IXC (interchange carrier, here MCI – explanation added) discovers (or with due diligence should discover). . ..", the event causing the damages claimed [71 F3d 1086 at 1416(1995)].

In the present matter, Comcast has not met its burden of due diligence. Since it had the cable box in its possession on or before June 14, 2002, it cannot reasonably argue concealment beyond that date. Similarly, since it had the allegedly modified cable box for nearly three year before filing suit, it similarly cannot reasonably argue that it met its burden of due diligence.

Finally, Comcast affirmed its awareness of a potential claim against the Defendant in its May 11, 2004 correspondence to Mr. Moran (EXHIBIT 3) in which Comcast alleges a claim under 47 U.S.C. § 553 against Mr. Moran and concedes that its expert "subsequently tested" the cable box he returned to Comcast on June 14, 2002. Nevertheless, Comcast failed to file its complaint against Mr. Moran until June 3, 2005.

There is no reasonable explanation Comcast can articulate in support of its dilatory practices, particularly in light of the undisputed set of facts and timeline.

Accordingly, where the statute of limitations has run and where Plaintiff cannot reasonably argue concealment nor that it has met its burden of due diligence in light of

the facts and authorities cited herein above, Plaintiff's claim pursuant to 47 U.S.C. § 553 must fail.

5.  **Plaintiff's failure to plead 47 U.S.C. § 605 within the applicable limitations period is fatal to Plaintiff's case based on federal law**

Assuming, arguendo, that 47 U.S.C. § 605 is the relevant statute, Plaintiff's failure to plead this cause of action is time-barred. There are a plethora of cases addressing the issue of alleged, unauthorized interception of scrambled telecommunications signals,

Significantly, the courts have been split in their decisions at to whether an individual ( as opposed to a carrier) alleged to have unlawfully intercepted cable signals is liable under 47 U.S.C. § 553 and/or 47 U.S.C. § 605. The present issue revolves around the application of the appropriate statute of limitations. Presently, the only federal statute pled by Plaintiff is 47 U.S.C. § 553.

Recently the Federal District court decided <u>Cablevision Of Connecticut, L.P. v. Robert Noferi,</u> 371 F. Supp. 2d 110(2005), which held in pertinent part" It is well settled that a defendant may be liable under both section 553(a)(1) and section 605(a)", <u>Noferi</u> , supra, at 113.

The instant issue of the statute of limitations for 47 U.S.C. § 553, a two (2) year limitations period, has been fully discussed herein above. Thus, in a light most favorable to Plaintiff, the inquiry shifts, in the alternative, to the applicability of the statute of limitations for 47 U.S.C. § 605, which is three(3) years, footnote 118 citing <u>Entertainment By J&J v. 78 Enterprises, Inc.,</u> S.D.N.Y., 2003, 2003 WL 1960586(unpublished).

The following facts are without dispute: 1. Plaintiff was in possession of the allegedly altered cable box on or before June 14, 2002; 2. Plaintiff filed its complaint against defendant on June 3, 2005; and 3. Plaintiff did not plead 47 U.S.C. § 605 in any way.

Assuming, arguendo, that 47 U.S.C. § 605 is the applicable statute of limitations, plaintiff must have pled this cause of action on or before June 15, 2005. **Plaintiff failed to do so.** Accordingly any claim under this section is time barred.

In 2004, the Untied States District Court in Georgia decided <u>DIRECTV, INC. V. JOHN WRIGHT</u>, 350 F.Supp.2d 1048 (2004) (attached hereto as EXHIBIT 4), in a case of cable signal privacy (herein attached as Exhibit 4). The Defendant had purchased a "pirate access" device, the proof of which was acquired by Plaintiff during the execution of a writ of seizure.

The issue in <u>WRIGHT</u>, supra, relevant to the present matter, is the event triggering the running of the applicable statute of limitations. <u>WRIGHT</u>, supra, distinguishes from the present matter in that Plaintiff acquired records indicating that the Defendant had purchased a device(s) that descrambled Plaintiff's signals. In the present matter, Plaintiff alleges that Mr. Moran altered his cable box, which it indisputably took possession of on or before June 14, 2002.

<u>WRIGHT</u>, supra, compares, however, in that in both cases there was an event that should have triggered Plaintiff's awareness that there may have been signal tampering. For the purposes of this analysis only, Defendant suggests that even if the cable box he returned had been altered, which he denies, then Comcast should have been on notice as of the date it received the cable box (June 14, 2002) and therefore, the statute should have begun to run on that date.

In <u>WRIGHT</u>, supra, the records were seized on January 24, 2002, and Plaintiff did not file a complaint until January 28, 2004, two years and four days later. The applicable statute in <u>WRIGHT</u>, supra, was two years. The Court recognizing the two year statue of limitations opined "like many statutes of limitations, [§2520(e)] does not require the claimant to have actual knowledge of the violation; it demands only that the claimant have had a reasonable opportunity to discover it." at 1056 citing <u>DAVIES V. ZIRKELBACH,</u> 149 F.3d 614, 618 (7th Cir. 1998).

In WRIGHT, supra, the Plaintiff argued that although it had the records on January 24, 2002, it took four days to have the records organized, Bates stamped and returned. The sum and substance of Plaintiff's argument was that the statue should have been tolled for four days, that is, until January 28, 2002 before running.

The Court held in pertinent part:

"It is undisputed that the seizure of records which led to the discovery of Defendant took place on January 24, 2002. Plaintiff is not arguing that there was any intervening raid, seizure of turnover of documents or business records or that the seizure on January 24, 2002, did not provide records that implicated Defendant. Plaintiff argues merely that after the seizure of the records on January 24, 2002, the Court should toll the start of the statute of limitations to permit Plaintiffs time to organize the seized records, make copies and number them with Bates stamp.

Plaintiff has cited not authority, and the Court has found none, that would provide for the tolling of the statute of limitations under § 2520(e) to permit Plaintiff time to organize, copy and bates stamp the documents it received. Section 2520(e) commences the statute of limitations when a 'claimant first has a reasonable opportunity to discover the violation.' Plaintiff first had such an opportunity when it executed the writ of seizure on EQ Stuff on January 24, 2002. Notably, Plaintiff argues that it acted diligently in preparing the documents and had received them back by January 28, 2004, four days after the seizure. Therefore, it appears that Plaintiff had the remainder of the following two years to discover Defendant's identity and bring suit against him. Neither the complex nature of the evidence, the volume of the records, nor the 'realities of the real world' provide Plaintiffs additional time where the plain language of the statute specifies otherwise. Where the records seized provide the Plaintiff with a reasonable opportunity to discover the violation, the mere fact that the Plaintiff did not avail itself of that opportunity in a timely fashion will not toll the statute of limitations. Since Plaintiff did not file suit until January 28, 2004 and the statute of limitations on Plaintiff's claim under 47 U.S.C. § 2511 ran on January 24, 2004, the Court finds that Plaintiff's claim is time-barred. Accordingly, Count III of Plaintiff's Complaint is hereby DISMISSED."

The Court's reasoning in its analysis of the tolling of the statute of limitations in <u>WRIGHT</u>, supra, is exactly on point with the present matter. That Plaintiff's reasonable opportunity in WRIGHT, supra, to discover alleged signal piracy by virtue of seized records differs from Comcast's actual possession of the allegedly altered cable box from Mr. Moran is a distinction without a difference. Both are events that trigger the "reasonable opportunity to discover" the respective Defendants' alleged tampering. Moreover, the <u>WRIGHT</u> supra, court found four (4) days beyond a two year statute of limitations no excuse for Plaintiff's failure to prosecute in the two year limitation period and dismissed a portion of Plaintiff's case. Presently, the Court should similarly find that twenty-seven (27) days (as of the date of this memorandum, July 11, 2005, Plaintiff has not pled a cause of action under 47 U.S.C. § 605) in excess of a presumed three year statute of limitations is preclusive.

Finally, Plaintiff's dilatory and negligent pleadings have unfairly prejudiced the Defendant. In the more than three years that have passed since the Plaintiff obtained exclusive custody and control there are reasonable questions as to the integrity of the alleged evidence. Defendant states that the chain of custody in this period is suspect and that the possibility of spoliation of evidence is a substantial and legitimate concern. Defendant has had no opportunity to have a timely examination, by an expert of his choosing of the cable box during this extended period.

These facts unfairly compromise defendant's ability to defend the present action. Similarly, it would be greatly prejudicial against the defendant for the Court to allow the Plaintiff and/or its agent(s) to certify that the purported evidence, which indisputably has been in the sole custody and control of the Plaintiff for more than three years, is in the exact condition it was on June 14, 2002. Such a certification would be, at best, self serving, and an unacceptable opportunity for spoliation.

Where Plaintiff is unquestionably a sophisticated telecommunications carrier, its failure to timely and properly plead this cause of action is inexcusable.

Accordingly, Plaintiff must be precluded from amending its complaint to include a claim pursuant to 47 U.S.C. § 605, et seq.

## V. CONCLUSION

For the reasons stated herein above and in the interests of fundamental fairness, Plaintiff's COUNT I and its prayers numbered 1 – 6 in its Complaint must be dismissed with prejudice.

Respectfully submitted,
Averill Moran,
By his attorney,

Frank J. Ingram
325 Central Street
Saugus, MA 01906
(781)233-2990
BBO No. 635348

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Comcast of Massachusetts I, Inc.                    Civil Action No.
("Comcast")
                                                    COMPLAINT FOR VIOLATIONS OF 47
    Plaintiff,                                      U.S.C. §553 AND CONVERSION

    vs.                                             05-11158MLW

Averill Moran

    Defendant

## NATURE OF ACTION

1. Plaintiff Comcast of Massachusetts I, Inc. ("Comcast") brings this Complaint to redress injuries that it has suffered as a result of Defendant Averill Moran's (hereinafter the "Defendant") cable television signal piracy.

2. The Defendant's use of statutorily prohibited electronic device(s) that descrambled and intercepted Comcast's cable television signals violated provisions of Title 47 U.S.C. § 553 and effectuated a conversion of the Plaintiff's property, its cable television signals.

## PARTIES

3. Comcast is a Massachusetts corporation and maintains a place of business at 6 Campanelli Drive, Andover, Essex County, Massachusetts.

4. The Defendant was and is an individual with her principal residence at 95 Pitman Street, Methuen, MA 01844. Upon information and belief, the Defendant resided at 95 Pitman Street, Methuen, MA at all times relevant to the said violations of 47 U.S.C. § 553.

## JURISDICTION AND VENUE

5. This action is brought pursuant to 47 U.S.C. § 553.

1

charge to view each event. Comcast provides subscribers with electronic decoding equipment (hereinafter referred to as "decoders") to decode these signals. Comcast programs these decoders so that a subscriber may only view that level of service, which he or she has purchased.

13. On information and belief, on or before 6/14/2002, the Defendant or some third party modified one (1) certain converters/descramblers, without Comcast's authorization, thereby creating descrambling device(s).

14. The descrambling device(s) was/were capable of defeating Comcast's encoding and scrambling technology.

15. On information and belief, the Defendant used the descrambling device(s) to receive, without authorization, scrambled or encoded programming and services offered over Comcast's system.

16. By using the unauthorized and illegal descrambling device(s), the Defendant was able to view Comcast's highest level of cable television programming and service, including premium channels and pay-per-view events, while only paying for a lower level of service.

## COUNT I
### (Violation 47 U.S.C. § 553)

17. Comcast re-alleges and incorporates by reference paragraphs 1 through 16 above.

18. The Defendant's conduct violated Title 47 U.S.C. § 553(a).

19. Comcast is a person aggrieved by the Defendant's violation of Title 47 U.S.C. §553 and is authorized to institute this action pursuant to Title 47 U.S.C. § 553(c)(1).

20. The cable transmissions that make up Comcast's signal are communications services offered over a cable system and, as such, are protected by Title 47 U.S.C.

3

§ 553.

22. Comcast did not authorize or consent to the Defendant's interception and use of its cable transmissions.

23. The Defendant's violations have injured Comcast's ability to generate revenue by depriving Comcast of payment for its programming.

## COUNT II

### (Conversion)

24. Comcast re-alleges and incorporates by reference paragraphs 1 through 23.

25. The Defendant exercised dominion and control over the Plaintiff's property, its cable television signals, without authorization or legal right to do so.

26. The Defendant's conduct was willful, intentional, malicious, and wrongful, with the intent to deprive the Plaintiff of the right to possession of its cable television signals.

27. As a direct and proximate result of the Defendant's conversion of the Plaintiff's signals the Plaintiff has suffered monetary damages; accordingly, the Defendant is liable for all of the Plaintiff's damages.

**WHEREFORE,** Comcast prays for Judgment against the Defendant and requests that the Court grant it the following relief:

1. Statutory damages of $10,000.00 for each violation of 47 U.S.C. § 553(a) pursuant to Title 47 U.S.C. § 553(c)(3)(A)(ii) and/or Title 47 U.S.C. § 553(c)(3)(B);

2. Money damages in favor of the Plaintiff for all damages the Plaintiff has suffered

4

as a result of the Defendant's conversion;

3.    Comcast's attorney's fees and costs in prosecuting this lawsuit as provided for by 47 U.S.C. 553(c)(2)(C);

4.    The issuance of a permanent injunction pursuant to provisions of 47 U.S.C. § 553 utilizing the following language or language of a similar nature:

"The Court hereby enjoins the Defendant, the Defendant's respective agents, servants, employees and any person or entity controlled directly or indirectly by the Defendant or acting on the Defendant's behalf from the further use and/or distribution of electronic equipment designed for the unauthorized interception of signals in violation of provisions of Title 47."

5.    Post judgment interest pursuant to 26 U.S.C. § 1961; and

6.    Such other and further relief as this Court may deem just and proper.

Respectfully Submitted for the Plaintiff,
Comcast of Massachusetts I, Inc.
By Its Attorney,

Date 6/2/05

John M. McLaughlin
Green, Miles, Lipton & Fitz-Gibbon LLP
77 Pleasant Street
P.O. Box 210
Northampton, MA 01061
Telephone: (413) 586-0865
BBO No. 556328

5

United States District Court,
N.D. Illinois,
Eastern Division.
CSC HOLDINGS, INC. Plaintiff,
v.
J.R.C. PRODUCTS, INC., et al. [FN1] Defendants.

**FN1.** The defendants are J.R.C. Products, Inc., Omega Holdings LLC, Teleview Inc.,
Teleview Distributors, Inc., Frank P. Redisi, Jr., Frank P. Redisi, Sr., Lance Rentio, Rec-
Tec Electronics, Inc., James Recchia, Frank Recchia, Joann Recchia, Elisa Recchia,
Anthony Recchia, Robert Recchia, Nora Recchia, John Does 1-10, Jane Does 1-10,
Unidentified Corporation 1- 10, Unidentified Business Entities 1-10, Omega of Elgin, Inc.,
and C & G Electronics, Inc.

No. 99 C 3516.
Dec. 17, 1999.

Cable television operator sued corporation and individual officers and employees under Cable
Communications Policy Act for sale of unauthorized cable signal decoders. Operator moved for
summary judgment. The District Court, Castillo, J., held that: (1) previous warning letter from
operator, FBI search of corporation, and national advertising by corporation did not start running of
limitations period; (2) active concealment by corporation tolled statute of limitations; (3) laches
defense was unavailable; and (4) officer of corporation was not immune from civil action by virtue of
previous criminal prosecution.
Motion granted in part and denied in part.

West Headnotes

**[1] KeyCite Notes**

**410 Witnesses**
  **410III Examination**
    **410III(D) Privilege of Witness**
      **410k309 k. Effect of Refusal to Answer. Most Cited Cases**

While a civil defendant's refusal to testify, in itself, is insufficient to support an adverse finding, trier
of fact may draw an adverse inference from such refusal when coupled with other evidence. U.S.C.A.
Const.Amend. 5.

**[2] KeyCite Notes**

**241 Limitation of Actions**
  **241II Computation of Period of Limitation**
    **241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action**
      **241k95 Ignorance of Cause of Action**
        **241k95(3) k. Nature of Harm or Damage, in General. Most Cited Cases**

Letters from cable television operator warning several businesses to stop selling "pirate" cable signal decoders, if they were doing so, did not commence running of statute of limitations as to operator's civil action under Cable Communications Policy Act against any of the businesses; letter did not reflect specific knowledge by operator that any recipient was engaged in unauthorized sales. Communications Act of 1934, §§ 415, 633, as amended, 47 U.S.C.A. §§ 415, 553.

[3] KeyCite Notes 

🔑 241 Limitation of Actions
 🔑 241II Computation of Period of Limitation
  🔑 241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
   🔑 241k95 Ignorance of Cause of Action
    🔑 241k95(3) k. Nature of Harm or Damage, in General. Most Cited Cases

Federal Bureau of Investigation (FBI) search of corporation suspected of selling "pirate" cable television decoders, and seizure of such decoders, did not put cable television operator on notice that it was one of the companies being victimized by piracy, so as to start running of two-year limitations period for operator's action under Cable Communications Policy Act against pirate corporation. Communications Act of 1934, §§ 415, 633, as amended, 47 U.S.C.A. §§ 415, 553.

[4] KeyCite Notes 

🔑 241 Limitation of Actions
 🔑 241II Computation of Period of Limitation
  🔑 241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
   🔑 241k95 Ignorance of Cause of Action
    🔑 241k95(3) k. Nature of Harm or Damage, in General. Most Cited Cases

National advertising by corporation involved in selling "pirate" cable television decoders did not serve to put cable operator on notice of particular violations of Cable Communications Policy Act, so as to start running of statute of limitations on operator's suit against corporation alleging such violations. Communications Act of 1934, §§ 415, 633, as amended, 47 U.S.C.A. §§ 415, 553.

[5] KeyCite Notes 

🔑 241 Limitation of Actions
 🔑 241II Computation of Period of Limitation
  🔑 241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
   🔑 241k104 Concealment of Cause of Action
    🔑 241k104(2) k. What Constitutes Concealment. Most Cited Cases

Active concealment by seller of "pirate" cable television decoders, including features of product itself designed to avoid detection, tolled statute of limitations applicable to cable operator's piracy action under Cable Communications Policy Act. Communications Act of 1934, §§ 415, 633, as amended, 47 U.S.C.A. §§ 415, 553.

[6] KeyCite Notes 

🔑 150 Equity
 🔑 150II Laches and Stale Demands

◇⋯**150k68** Grounds and Essentials of Bar
   ◇⋯**150k72** Prejudice from Delay in General
      ◇⋯**150k72(1)** k. In General. <u>Most Cited Cases</u>

Court may exercise its discretion to grant a laches defense when a defendant's ability to defend is impaired by plaintiff's inexcusable delay in bringing lawsuit.

[7] KeyCite Notes 

◇⋯**372** Telecommunications
   ◇⋯**372X** Interception or Disclosure of Electronic Communications;   Electronic Surveillance
      ◇⋯**372X(A)** In General
         ◇⋯**372k1442** Actions
            ◇⋯**372k1446** k. Time to Sue and Limitations. <u>Most Cited Cases</u>
            (Formerly 372k498)

Laches defense was inapplicable to cable television operator's action under Cable Communications Policy Act against alleged seller of "pirate" cable signal decoders; operator was not required to sue as soon as it suspected piracy, operator brought action without intentional delay once action accrued, and seller by own admission did not come to court with clean hands. Communications Act of 1934, § 633, as amended, <u>47 U.S.C.A. § 553</u>.

[8] KeyCite Notes

◇⋯**393** United States
   ◇⋯**393I** Government in General
      ◇⋯**393k50** Liabilities of Officers or Agents for Negligence or Misconduct
         ◇⋯**393k50.5** Immunity or Privilege in General
            ◇⋯**393k50.5(1)** k. In General. <u>Most Cited Cases</u>

Burden of establishing an immunity defense as government agent is on person claiming that defense.

[9] KeyCite Notes

◇⋯**372** Telecommunications
   ◇⋯**372VI** Cable Television
      ◇⋯**372k1250** Civil Liability for Unauthorized Interception or Viewing
         ◇⋯**372k1251** k. In General. <u>Most Cited Cases</u>
         (Formerly 372k498)

Plea agreement resulting from criminal prosecution of officer of corporation involved in selling "pirate" cable television decoders did not entitle officer to immunity from civil action brought by cable operator under Cable Communications Policy Act, especially where agreement expressly applied to "criminal liability only," and absent evidence that officer was government employee.
*796 Daniel J. Lefkowitz, P.C., Jericho, NY, (by <u>Daniel J. Lefkowitz</u>, <u>Patrick J. Sullivan</u> and Wayne R. Louis), <u>Ronald S. Safer</u>, Schiff, Hardin & Waite, Chicago, IL, (local counsel) for plaintiff CSC Holdings, Inc.
James Recchia, Frank Recchia, Joann Recchia, Elisa Recchia, Anthony Recchia, Robert Recchia and Nora Villalobos, Wolin & Rosen, Chicago, IL, (by <u>Jeffrey Schulman</u>), for defendants J.R.C. Products, Inc., Rec-Tec Electronics, Inc., C & G Electronics, Inc.
Frank Redisi, Sr., Frank Redisi, Jr., Freeborn & Peters, Chicago, IL (by Fred Forman, <u>Anthony Carballo</u> and <u>Aren L. Fairchild</u>), for defendants Teleview Inc., Teleview Distributors, Inc., Omega Holdings, LLC,

and Omega of Elgin, Inc.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

The plaintiff, CSC Holdings, Inc. ("Cablevision"), seeks injunctive relief and monetary damages against seven business defendants and nine individual defendants (collectively "defendants") for the alleged sale of "pirate" cable television decoders in violation of the Cable Communications Policy Act of 1984, 47 U.S.C. § 553, and various state laws. Currently before the Court is Cablevision's motion for summary judgment on the claims brought under § 553, and a cross motion for summary judgment by two of the individual defendants. The Court grants Cablevision's summary judgment motion as to the liability of all defendants except Anthony Recchia, who we dismiss from the case. We deny the Redisis cross motion for summary judgment.

### RELEVANT FACTS

The following facts are derived from the parties' Local General Rule 12 statements and evidentiary materials submitted to the Court in connection with the pending summary judgment motions.

#### A. The Plaintiff and Its Business

Cablevision provides cable television services in New York, Connecticut, Massachusetts, New Jersey, Ohio and Michigan. It offers a variety of programming packages to its subscribers, including basic, premium and pay-per-view services. Cablevision's subscribers receive a "converter," which changes cable signals into viewable programming. To prevent subscribers from receiving services that they have not paid for, Cablevision encodes or scrambles the signals for its premium and pay-per-view programming. Only those subscribers who purchase these services are provided with a converter containing a "decoder." Cablevision's programming, however, can be illegally received by non-subscribers with the use of a "pirate decoder," which unscrambles encoded programming.

#### B. The Plaintiff's Investigation of the Defendants

In March 1998, Cablevision commenced an investigation to determine if the defendants were selling pirate decoders in Cablevision's system areas. The initial investigation consisted of reviewing information from public filings regarding the nature of the defendants' businesses and their principals. Cablevision also took photographs at the defendants' business locations and obtained discarded business documents which suggested that the defendants were selling pirate decoders. The public filings indicated that Teleview, Inc. ("Teleview"), Omega Holdings LLC ("Omega Holdings"), J.R.C. Products, Inc. ("JRC"), Rec-Tec Electronics, Inc. ("Rec-Tec"), and C & G Electronics, Inc. ("C & G"), were doing business at the same location and were fundamentally the same business. Furthermore, a Cablevision investigator purchased six pirate decoders by phone from the defendants between March 3, 1998 and **\*797** May 13, 1999. Cablevision found that these decoders were able to descramble all of Cablevision signals.

Based on this evidence, we granted Cablevision's ex parte request for a temporary restraining order, a preliminary injunction, expedited discovery, an order freezing the defendants' assets, an accounting, and a seizure order. (R. 6, Minute Order of May 28, 1999.) Pursuant to this order, on June 2, 1999, United States Marshals seized fifteen pirate decoders from the defendants' business. Cablevision tested the pirate decoders and all but one was capable of descrambling encoded cable television signals. The Marshals also seized computers and numerous documents including inventory lists, sales records, customer correspondence, internal memoranda, sales flyers, invoices, employee charts, and payroll checks.

#### C. The Defendants

#### 1. The Business Defendants

#### a. Teleview Distributors Inc., Teleview, and Omega Holdings

Teleview Distributors, Inc. ("Teleview Distributors"), Teleview, and Omega Holdings were functionally one business, located at 1520 Commercial Drive, Elgin, Illinois, operating under different names. The business, under its various names, sold pirate decoders to customers residing in Cablevision's franchise areas, and advertised their decoding devices as "bullet proof," meaning their use could not be detected by the cable company. The business first operated under the name of Teleview Distributors, then Teleview, and finally Omega Holdings. The name change was discovered when, during its investigation, Cablevision called Teleview's 800 number, ordered a pirate decoder, and was told to make the money order payable to Omega Holdings.

#### b. Omega Holdings and Omega of Elgin

In November 1998, all of Omega Holdings' assets were sold to Omega of Elgin. These assets included

furniture, fixtures, tools, office supplies, telephones and computers which were sold "as is." None of the records on the computers were deleted, and sales records from Omega Holdings remained on the computers sold to Omega of Elgin.

While the Redisi defendants contest that there was a "transfer of business" between Omega Holdings and Omega of Elgin, they admit that Frank Redisi, Sr. ("Redisi Sr."), was responsible for selling Omega Holdings' assets to Omega of Elgin, including the sales records on the computers. In a letter dated November 6, 1998, Frank Redisi, Jr. ("Redisi Jr.") instructed Redisi Sr. to liquidate all of Omega Holdings' assets and to "use any proceeds to satisfy any unpaid taxes, debts, to vendors, customers, attorneys, etc. If there are any funds remaining, do with them as you wish." At the time of the sale, both Redisi Sr. and Redisi Jr. had ownership interests in Omega Holdings.

### c. Omega of Elgin, JRC, Rec-Tec, and C & G

Omega of Elgin, JRC, Rec-Tec, and C & G were functionally the same business. They were located at 139, 141, 143 West River Road, Elgin, Illinois; they shared facilities, equipment and inventory; and they all sold pirate decoders to customers residing in Cablevision's franchise areas.

Documents seized on June 2, 1999 demonstrate that Omega of Elgin, JRC, Rec-Tec and C & G had common employees and officers including many of the named individual defendants. These documents include Omega of Elgin's weekly payroll checks and JRC employee hour charts for 1999, which both list defendants James Recchia, Frank Recchia, Joann Recchia, Elisa Recchia and Nora Villalobos as employees. Further, corporate records establish common management: a JRC Small Business Corporation 1998 document identifies defendants James Recchia, Frank Recchia, and Robert Recchia as JRC shareholders, a Rec-Tec Corporation Book lists Robert Recchia as President *798 and Director, and a C & G Corporation Book lists Frank Recchia as President and Secretary. Frank Recchia, James Recchia, Joann Recchia and Nora Villalobos also worked for Teleview Distributors, Teleview and/or Omega Holdings.

### 2. The Individual Defendants

#### a. Redisi Sr.

Redisi Sr. admits that he had an ownership interest in Teleview Distributors, but, relying on the Fifth Amendment, refused to answer questions regarding his relationship to Teleview and Omega Holdings. Testimony by his son, Redisi Jr., and information taken from public record, however, prove that Redisi Sr. had an ownership interest in, and earned income from, Teleview and Omega Holdings, as well as Teleview Distributors.

Redisi Jr. testified that he and Redisi Sr. were owners of Teleview in November 1992 when Redisi Jr. was charged with violating § 553; that he and his father were the sole owners of Teleview between 1993 and 1995; and that either he or his father received the highest income from Teleview and Omega Holdings. He also admitted that the equipment sold by Teleview Distributors, Teleview and Omega Holdings was intended to enable customers to receive illegal cable services.

Redisi Sr. admits liquidating Omega Holdings' assets, including the computers with Omega Holdings' sales records, by selling them to Omega of Elgin and JRC in November 1998. Redisi Sr. also admits performing professional bookkeeping work for Omega of Elgin and JRC between December 1998 and April 1999.

#### b. Redisi Jr.

Redisi Jr. worked for Teleview Distributors from 1990-93, for Teleview from 1993-95, and for Omega Holdings from 1995-98. Redisi Jr. admits that Teleview Distributors, Teleview and Omega Holdings were "illegal businesses" which sold pirate decoders, and that he was part owner of all three of these companies.

In November 1992, the FBI served a search warrant on Teleview, and as a result Redisi Jr. was later criminally charged with one count of violating 47 U.S.C. § 553. Redisi Jr. states that he began cooperating with the federal government sometime in 1996 as part of a plea agreement. Ultimately, Redisi Jr. pled guilty and admitted that he and his companies sold approximately 25,000 pirate decoders between February and November 1992. On November 12, 1998, Redisi Jr. was sentenced; he is currently on probation.

#### c. James, Frank, and Robert Recchia

James, Frank, and Robert Recchia were the officers and shareholders of the business defendants described above. They were also employees of the corporate defendants. Each of them was present at the June 2 civil seizure, and, during their depositions, each man invoked his Fifth Amendment privilege against self-incrimination in response to every question regarding the pirate decoder business.

#### d. Joann and Elisa Recchia and Nora Villalobos

Joann and Elisa Recchia and Nora Villalobos were each employees of the corporate defendants. Joann and Nora were present at the June 2 civil seizure. Elisa and Nora were telephone salespeople who sold pirate decoders to Cablevision's investigator.

**e. Anthony Recchia**

The only evidence Cablevision offers against Anthony Recchia is that a vehicle registered to him was observed in the parking lot adjacent to the JRC business location on February 22, 1999, and a fax bearing the name "Anthony" was recovered at the defendants' business during the civil seizure. Anthony Recchia testified at his deposition that he had been employed for the past two and one-half years, working 40 hours per week, for a company named Cinch. During his deposition, Anthony Recchia invoked his Fifth *799 Amendment privilege against self-incrimination as to each question regarding the defendants' business.

**D. The Defendants' Arguments Against Summary Judgment**

The defendants generally admit the illegal nature of the activities conducted by the business defendants. However, the defendants present various defenses as to their individual involvement in the alleged § 553 violations.

**1. The Recchia Defendants**

James, Frank, Robert, Joann, and Elisa Recchia, and Nora Villalobos (collectively the "Recchia Defendants") all admit that the corporate defendants sold pirate decoders to cable subscribers knowing and intending that they could use the devices to receive scrambled premium and pay-per-view programming services without paying Cablevision. The Recchia Defendants also admit that the businesses advertised their devices as "bullet proof" and "non-detectable," meaning that they could not be detected by the cable operator servicing the area where the device was to be used.

The Recchia Defendants, plus Anthony Recchia, filed a joint statement of opposition to Cablevision's summary judgment motion. They claim that Cablevision knew or should have known about the alleged illegal activities as early as 1991, and argue that a two-year statute of limitations bars this action. Additionally, they maintain that joint and several liability may not be imposed against them in this case.

Several of the Recchia Defendants assert individual defenses as well. Anthony Recchia contends that he was not involved with any of the defendant companies. Joann Recchia and Nora Villalobos claim only that they did not have management positions at any of the defendant companies. Elisa Recchia and Robert Recchia assert they were not involved with any of the companies prior to late 1998. Finally, Frank Recchia asserts that he did not work for the defendant businesses between 1996 and 1998.

**2. The Redisi Defendants**

Redisi Sr., and Redisi Jr., (collectively the "Redisi Defendants"), also filed a joint statement of opposition to Cablevision's summary judgment motion. Moreover, they filed a cross motion for summary judgment.

The Redisi Defendants claim that Cablevision knew, or should have known, about the alleged cable piracy activities since the early 1990's and, therefore, Cablevision's claims are barred by a two-year statute of limitations and the doctrine of laches. They also argue that Cablevision has not identified a violation of § 553 by Redisi Sr. Finally, they contend that because of his plea agreement, Redisi Jr. was an agent of the government between 1996 and 1998, and therefore that he is entitled to immunity for any violations of § 553 that he may have committed during that time period.

**E. Cablevision's Arguments Against the Cross Summary Judgment Motion**

Cablevision argues that it did not have actual knowledge of its cause of action before it began its current investigation of the defendants in March 1998. Cablevision maintains that any general suspicion it might have had at an earlier date that defendants were selling pirate decoders was insufficient to start the applicable statute of limitations period. Further, Cablevision asserts that the defendants' actions represent a continuing violation, making the present action timely regardless of the applicable statute of limitations. Cablevision argues that the undisputed facts establish Redisi Sr.'s involvement in the alleged illegal activity. Finally, Cablevision maintains that Redisi Jr. was not an employee or agent of the federal government and cannot claim immunity.

THE RELEVANT STATUTE

Cablevision seeks summary judgment only on its claims arising under the Cable Communications Policy Act, *800 47 U.S.C. § 553. Section 553 provides in pertinent part,

(a)(1) No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

(a)(2) For the purpose of this section, the term "assist in intercepting or receiving" shall include the manufacture or distribution of equipment intended by the manufacturer or distributor (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1).

The defendants rely heavily on the statute of limitations set forth in 47 U.S.C. § 415, which provides:
(a) All actions at law by carriers for recovery of their lawful charges, or any part thereof, shall be begun within two years from the time the cause of action accrues, and not after.
(b) All complaints against carriers for the recovery of damages not based on overcharges shall be filed with the Commission within two years from the time the cause of action accrues, and not after, subject to section (d) of this section.

## LEGAL STANDARDS

Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc., 40 F.3d 146, 150 (7th Cir.1994). A genuine issue for trial exists only when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must view all evidence in a light most favorable to the nonmoving party, and draw all reasonable inferences from the evidence in the nonmovant's favor. Cincinnati Ins., 40 F.3d at 150. However, if the evidence is merely colorable, or is not significantly probative, or merely raises some metaphysical doubt as to the material facts, summary judgment may be granted. Liberty Lobby, 477 U.S. at 261, 106 S.Ct. 2505; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In making this determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. Liberty Lobby, 477 U.S. at 255, 106 S.Ct. 2505.

Where cross motions for summary judgment have been submitted, the court is not required to grant judgment as a matter of law for one side or the other. Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir.1993). The court must evaluate each party's motion on its own merits, resolving factual uncertainties and drawing all reasonable inferences against the party whose motion is under consideration. Id.; Buttitta v. City of Chicago, 803 F.Supp. 213, 217 (N.D.Ill.1992), aff'd, 9 F.3d 1198 (7th Cir.1993).

## DISCUSSION

### A. Liability Under 47 U.S.C. § 553

Section 553 prohibits the manufacture and distribution of pirate encoders. Individuals, as well as corporations, can be liable for violations of § 553. See generally United States v. Norris, 88 F.3d 462 (7th Cir.1996); 47 U.S.C. §§ 553(a) and (c). A violator's intent is irrelevant to the question of liability; rather, intent goes to the appropriate level of damages. 47 U.S.C. § 553(c)(3)(B) and (c)(3) (C).

### 1. Evidence of Defendants' Unauthorized Distribution of Pirate Cable Decoders

Undisputed evidence in the record shows that the corporate defendants, without *801 authorization, distributed pirate decoders for the sole purpose of enabling their customers to illegally intercept Cablevision's cable services without paying. The record is replete with evidence which overwhelmingly demonstrates this fact. The defendants' own statement of facts conclusively establishes that the business defendants sold pirate decoders to customers residing in Cablevision's franchise areas, and that their devices were specifically advertised as undetectable by Cablevision.

Each of the individual defendants, with the sole exception of Anthony Recchia, was sufficiently involved with one or more of the businesses to satisfy the low threshold for liability required by the statute. As to the Recchia Defendants, James, Frank and Robert Recchia were officers, employees, and shareholders of the various defendant businesses, and were present at the civil seizure. Joann and Elisa Recchia, and Nora Villalobos were employees of the various defendant businesses and received weekly pay checks from them. Joann and Nora also were present at the civil seizure. The record evidence implicates both Elisa and Nora as telephone salespersons who sold pirate decoders to Cablevision's investigators for use in Cablevision's franchise areas to intercept cable services without payment or detection.

Similarly, the Redisi Defendants had ownership interests in Teleview and Omega Holdings, and were the sole owners of the Teleview entities from at least 1991 to 1995, during which time Redisi Jr. was charged with violating § 553 in connection with Teleview's illegal business activities. Redisi Jr.

admitted that the pirate decoders were intended to enable customers to receive cable programming without paying for it. Both Redisis received significant income from Teleview and Omega Holding, which Redisi Jr. testified grossed millions of dollars in the years he worked there. Redisi Jr. admits working for the Teleview and Omega entities from 1990 to 1998. In November 1998, Redisi Sr. liquidated all the assets of Omega Holdings to Omega of Elgin and JRC, and he received JRC checks in payment for Omega Holdings' assets. Redisi Sr. performed bookkeeping services for Omega of Elgin and JRC between December 1998 and April 1999 following this sale.

The facts in the record indicate that each of the Recchia and Redisi Defendants, except for Anthony Recchia, was sufficiently involved with the defendant businesses as officers, managers, shareholders, and/or employees to hold them individually liable for assisting in the unauthorized interception or reception of cable services under the statute.

[1]    Furthermore, we may infer involvement in the illegal activities by the individual defendants from their invocation of their Fifth Amendment privilege against self-incrimination. Unlike criminal cases, where no adverse inference may be drawn from a defendant's refusal to testify, in the civil arena, the trier of fact is permitted to draw an adverse inference from a party's refusal to testify. _Baxter v. Palmigiano, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)_. While a refusal to testify, in itself, is insufficient to support an adverse finding against a defendant, when coupled with other evidence, the trier of fact may draw an adverse inference from the fact that a defendant invoked the Fifth Amendment. _Id.; see also LaSalle Bank Lake View v. Seguban, 54 F.3d 387, 390 (7th Cir.1995)_.

The Seventh Circuit, however, has cautioned that an adverse inference drawn from a defendant's assertion of the Fifth Amendment in a civil case cannot rest solely on the silence. _See, e.g., LaSalle Bank, 54 F.3d at 391_ (A defendant's refusal to testify should "be weighed in light of other evidence rather than leading directly and without more to the conclusion of guilt or liability."); _see also National Acceptance Co. of Am. v. Bathalter, 705 F.2d 924, 932 (7th Cir.1983)_. Thus, a defendant's claim of privilege is not properly deemed an admission of the entire complaint. Instead, a plaintiff must be "put to its proof, either by way of evidentiary support for a motion for summary judgment *802 or a trial." _National Acceptance, 705 F.2d at 932_. In this case, the record contains sufficient supporting evidence to reasonably draw adverse inferences about each individual defendant's liability under § 553 (with the exception of Anthony Recchia and Redisi Jr., who did not refuse to testify) from their Fifth Amendment invocations.

The record evidence overwhelmingly establishes that the corporate defendants, the Redisi Defendants, Nora Villalabos, and James, Frank, Joann, Elisa, and Robert Recchia are liable to Cablevision for violating § 553. For this reason, we grant Cablevision's summary judgment motion with regard to these defendants.

On the other hand, Cablevision's evidence against Anthony Recchia is sorely lacking. No evidence ever tied him, directly or indirectly, to any § 553 violation. The only evidence against Anthony Recchia is that he invoked his Fifth Amendment privilege, his car was once seen parked outside of a corporate defendant, and a fax bearing the name "Anthony" was recovered during the civil seizure. This simply is not enough to show that Anthony was involved in the other defendants' sale of pirate decoders. _See National Acceptance, 705 F.2d at 932_.

**B. Defendants' Affirmative Defenses**

The defendants have proffered several affirmative defenses, all of which we reject for the reasons stated below.

**1. Statute of Limitations Defense**

The defendants argue that Cablevision's § 553 claim is barred by a two year statute of limitations because Cablevision either knew or should have known of its injury as early as 1991 and did not file suit until 1999. Even assuming that the defendants correctly identify 47 U.S.C. § 415 as the source of the governing limitations period, we reject the defense for two reasons. First, there is nothing in the record to indicate that Cablevision was put on notice of injury by these specific defendants until it began its own investigation of them in 1998. Second, the defendants' § 553 violations were ongoing from at least 1991 until this action was filed in 1999 and, therefore, under the continuing violation doctrine, this action was timely filed.

[2]    The defendants argue that several activities and events occurring between 1991 and 1996 should have put Cablevision on notice of its cause of action. For example, in 1991 Cablevision sent

letters to various companies across the country, including at least one owned by Redisi Jr., warning them to cease and desist if they were selling pirate decoders in Cablevision's market areas. These letters, however, do not reflect specific knowledge by Cablevision that Teleview, or any of the other recipients, was actually selling pirate decoders in its market areas. At most, these letters reflect speculation or mere suspicion that the defendants may have been selling pirate decoders. *Sokol Crystal Prods., Inc. v. DSC Communications Corp.,* 15 F.3d 1427, 1430 (7th Cir.1994) (a party is not required to bring suit based on mere suspicions that it might be suffering damages).

[3]    The defendants next claim that, because Cablevision had an ongoing relationship with the FBI, it should have known about its cause of action against Teleview. Specifically, the defendants argue that Cablevision was put on notice of Teleview's violation when the FBI executed a search warrant on Teleview and seized several pirate decoders in 1992. We disagree; the FBI's search of Teleview, at most, notified Cablevision, as well as other cable companies, that the FBI was investigating Teleview--a company which could have been ripping off any number of cable companies. The simple fact that the FBI seized numerous pirate decoders did not put Cablevision on notice that it was definitely one of the companies being ripped off. Furthermore, based on the FBI's actions, Cablevision could have reasonably concluded that Teleview was now out of the cable piracy business because of the FBI investigation and seizure. Cablevision was not **803** required to investigate further at that point, and certainly could not be expected to surmise that the defendants would have the audacity to change their name and go right back into the cable piracy business, despite the FBI's actions.

[4]    The defendants also state that between 1991 and 1995 they advertised their products in national magazines. Again, at most, the advertisements gave Cablevision an awareness that the defendants were participating in a national illegal market; the ads did not, however, give Cablevision specific notice of a particular violation against it. This precise argument was rejected by the District Court of Arizona in *Time Warner Cable v. Cable Box Wholesalers, Inc.:*
Defendants argue that the plaintiff should have been aware of Cable Box's conduct because of the defendants' widespread magazine advertising of decoders for sale. This argument suggests that defendants' cable piracy activity was so open and notorious that what was taking place should have been obvious to plaintiff. Sale of decoders is not an uncommon occurrence. The decoders sold by the defendants, however, were modified to enable purchasers to intercept plaintiff's cable signals. There is no evidence that the plaintiff knew or should have known of this fact.
920 F.Supp. 1048, 1053 (D.Ariz.1996).

[5]    Furthermore, the defendants had reason to actively conceal their illicit activity from Cablevision, and the product itself contained features for the purpose of avoiding detection by Cablevision. Such concealment tolls a statute of limitations. *Hochfelder v. Ernst & Ernst,* 503 F.2d 1100 (7th Cir.1974) ( "[W]here a fraud which is the foundation of the suit has been actively concealed or is of such a nature as to conceal itself, the statute of limitations is tolled until the plaintiff has obtained knowledge of the fraud or in the exercise of due care should have obtained knowledge of the fraud."). Under these circumstances, the defendants' statute of limitations defense must fail.

## 2. Doctrine of Laches

[6]  [7]    The defendants argue that Cablevision's claims are barred by the doctrine of laches because Cablevision's delay in bringing this claim has caused the defendants undue prejudice. A court may exercise its discretion to grant a laches defense when a defendant's ability to defend is impaired by the plaintiff's inexcusable delay in bringing the lawsuit. For example, a laches defense may be appropriate when the delay results in the loss of evidence or witnesses.
In *Sokol,* however, the Seventh Circuit rejected the defendants' laches defense for the same reason it rejected the statute of limitations argument: Sokol was not required to bring suit when it merely suspected that it was being injured by the defendant. *Sokol,* 15 F.3d at 1430. The same reasoning applies here. Because the Court finds that Cablevision brought this action in a timely manner without intentional delay, the Court finds that the doctrine of laches does not apply.
Furthermore, laches is an equitable doctrine that requires the party claiming its benefit to come to

court with clean hands. According to the evidence in this case, including the defendants' own testimony, the defendants' hands are far from clean: they admit knowingly violating § 553 over an extended period of time, and regularly changed corporate names to avoid detection. Furthermore, any prejudice resulting from lost evidence will probably affect both parties equally during the damages phase of this action. For these reasons, we reject the defendants' laches defense.

**3. Governmental Immunity Claim of Redisi Jr.**

Redisi Jr. claims that he was an employee of the federal government and an agent of the FBI between 1996 and 1998, and is therefore entitled to immunity during that period. He claims that his activities at Omega Holdings, including the sale of pirate decoders into Cablevision's market areas, were at the direction and behest of the *804 FBI, and on this basis seeks to avoid liability for the illegal activities of Omega Holdings which he admits transpired during that time.

[8]  [9]  The burden of establishing an immunity defense is on the person claiming that defense; Redisi Jr. has not met that burden. The only evidence he offers to support his claim that he was a government agent is the plea agreement and his own unsupported testimony that he was a government agent. The plea agreement, however, does not mention any cooperation arrangement and does not state that Redisi Jr. would be immune for violations of any kind. To the contrary, the agreement specifically states

This plea agreement concerns criminal liability only, and nothing herein shall limit or in any way waive or release any administrative or judicial claim, demand or cause of action, whatsoever, of the United States or its agencies. Moreover, this Agreement is limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities, except as expressly set forth in this agreement. Additionally, Redisi Jr. has not produced any evidence that he is a government employee as that phrase is used in 28 U.S.C. § 2671 and *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). For these reasons, Redisi Jr. cannot succeed on his immunity defense.

### CONCLUSION

For the foregoing reasons, Cablevision's claims against Anthony Recchia are dismissed with prejudice. Cablevision's summary judgment motion is granted as to all remaining defendants. The Redisi Defendants' joint motion for summary judgment is denied.

In accordance with this opinion judgment is entered on liability against all remaining defendants. The Court will retain jurisdiction to consider the issue of damages. Cablevision is directed to file a proposed litigation plan to deal with remaining issues in this case by January 4, 2000. The defendants may file a written response on or before January 7, 2000. As previously ordered, a status hearing will be held on January 10, 2000 at 9:45 a.m. to set a firm litigation schedule for the remaining damages issues in this lawsuit.

N.D.Ill.,1999.

CSC Holdings, Inc. v. J.R.C. Products, Inc.

78 F.Supp.2d 794

END OF DOCUMENT

<u>West Reporter Image (PDF)</u> 

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# McLaughlin Sacks, LLC

## Attorneys at Law
### 31 Trumbull Road
### Northampton, MA 01060

John M. McLaughlin
Admitted in Massachusetts and Connecticut

Harley M. Sacks
Admitted in Massachusetts and New York

May 11, 2004

Avrill Moran
95 Pitman Street
Methuen, MA 01844

      RE:  **Comcast vs. Avrill Moran**
          **MS ID:**    **3748**

Dear Avrill Moran:

      This office represents Comcast of Massachusetts I, Inc., which holds the franchise to distribute cable television signals in your area (hereinafter "Comcast"). Comcast is the successor in interest to any prior entity, which held the franchise in your area. This correspondence amends, alters and/or supersedes any prior correspondence you may have received from Comcast's predecessor or on behalf of Comcast's predecessor in interest regarding these matters.

      The statements set forth herein represent our good faith contentions as to the status of applicable law in conjunction with the evidence derived from my client's investigation to date. This letter is being sent to you in furtherance of my client's investigation into this matter and to offer you a settlement with reference to this situation. It is my understanding that counsel on this matter does not presently represent you. If counsel actually represents you please forward this correspondence to your counsel for review. If you are not represented, you are encouraged to retain your own legal counsel.

      Comcast's investigation has revealed that, on or about June 14, 2002 a certain converter/descrambler bearing the serial number HD591FMGC that had been issued to your account was returned to Comcast. An expert subsequently tested this converter/descrambler. Diagnostic testing revealed that the converter/descrambler had clearly been modified in order to receive the scrambled signals of Comcast (premium channels and pay per view events) in an unscrambled manner without Comcast's authorization and without payment for the same. A converter/descrambler modified in this manner is, in essence, an illegal descrambling device (hereinafter "descrambling device").

      *Using* a descrambling device to obtain the unauthorized interception of Comcast's cable television signals violates provisions of Title 47 of the U.S. Federal Code. Evidence that you were in possession of a descrambling device can easily lead a reasonable person to the logical inference that it was used. In fact, a Federal appellate has found that evidence of an individual purchasing and installing a descrambling devices is sufficient evidence "to create *at least a rebuttable presumption*" of unauthorized interception (emphasis added). See, *Community Television Sys. Inc. v. Caruso* 284 F. 3d 430, at 433 (2d Cir. 2002).

Avrill Moran
5/11/2004
Page 2

        Pursuant to Federal statutes Comcast has the right to bring a civil action (a lawsuit) in Federal Court seeking recovery its actual damages or (at Comcast's option) seeking statutory damages (damages set forth in the Statute) against individuals who use descrambling devices to obtain Comcast's signals without authorization and proper payment. The Statutory Damage provisions provide for damages from $250.00 to $10,000.00 for the use of a descrambling device to receive signals without authorization or proper payment. The trier of fact has discretion to award attorney's fees and costs in a successful prosecution under this Federal Statute.

        It is our position that a reasonable person can make the logical inference that you used the descrambling device to obtain Comcast's signals without authorization and proper payment. Yet, as part of my client's investigation into this matter, my client would prefer to have you or your lawyer contact me in order that I may hear what you have to say about this situation. Accordingly, I request that you or your attorney call or write my office with your response to this letter.

        At this time, Comcast has authorized us to extend an offer to settle claims it may have against you based upon it's investigation to date for a one time payment amount of $3,500.00, even though Comcast may be entitled to greater damages under Federal Law. Should you wish to enter into such a settlement you must do one of the following:

   1.   Send a bank check, certified check, or money order, **WITH YOUR NAME AND FILE NUMBER CLEARLY PRINTED ON IT**, in the amount of $3,500.00 to this law firm, endorsed to "MCLAUGHLIN SACKS, LLC", and call my office to make arrangements for the surrender of any device that is used to modify converter/descramblers (such a device is commonly referred to as a "chip") or any other descrambling devises which you may have in your possession, or

   2.   Call "MCLAUGHLIN SACKS, LLC" at 1-800-432-4390 Ext 3 and pay the $3,500.00 by either VISA, MASTERCARD or DISCOVER credit card and to make arrangements for the surrender of any chip or any descrambling devises which you may have in your possession.

Once your payment has been received, I will send you two copies of a Mutual Settlement Agreement and Release document which will release you for any unauthorized interception through the residential use of the descrambling device and that will serve to document the terms of the resolution of this matter. You would then execute both documents and return them to my office. Comcast would then execute both documents and I would return one fully executed release document to you. At that point my office would release the settlement funds to Comcast.

        If, however, there is no response to this inquiry within thirty (30) days after the date of this letter or there is a response, but the response is evasive or unsatisfactory, then, my firm will confer with Comcast about bringing a civil action against you in Federal District Court. If a Federal District Court action is brought against you:

        1.   Any and all settlement offers previously made or discussed (including, without limitation, the settlement offer of $3,500.00) are automatically withdrawn without any additional notification;

Telephone (413) 586-8865                                                   Facsimile (413) 584-0453

Avrill Moran
5/11/2004
Page 3

    2.    Comcast will seek civil statutory damages (reserving the right, at its option, to proceed against you by proving actual damages) and seek the reimbursement of its attorney's fees and costs.

Also, in light of the fact that you may still be in possession of a descrambling device, if a descrambling device is not surrendered or if this matter is otherwise amicably resolved within the timeframe set forth above, you are hereby given notice that, if your cable service has not already been terminated, your cable television service MAY be terminated at that time or at such time thereafter, as Comcast shall decide. So long as you may have the continuing ability to obtain unauthorized signals with a chip and/or other descrambling device, Comcast is not obligated to and has the option to terminate you as a cable television customer. Comcast continues to have the option to conduct this termination even if there have been communications between you or your attorney and my office regarding this matter. Notwithstanding any of the above, if your service is terminated during a pay period in which you have prepaid, you will be credited for the appropriate amount.

Please call my office or have your attorney call my office to discuss this matter further.

Thank you.

Very truly yours,
MCLAUGHLIN SACKS, LLC

John M. McLaughlin

JMM/kkb

**West Reporter Image (PDF)** 📧

350 F.Supp.2d 1048

**Motions, Pleadings and Filings**

United States District Court,
N.D. Georgia,
Atlanta Division.
DIRECTV, INC., Plaintiff,
v.
John WRIGHT, Defendant.
No. CIV.A. 1:04CV0242RWS.
Dec. 14, 2004.

**Background:** Provider of satellite television programming sued buyer of "pirate access" devices, designed to disable security measures used by provider, asserting claims under Federal Communications Act (FCA) and Wiretap Act. Buyer moved to dismiss on statute of limitations grounds.

**Holdings:** The District Court, <u>Story</u>, J., held that:
(1) FCA claims were governed by limitations period applicable to actions brought under Georgia statute prohibiting theft of telecommunications services, rather than by Copyright Act's limitations period, and
(2) limitations period for Wiretap Act claim was not tolled between date when provider executed writ of seizure at seller's premises, and time when provider received bates-stamped, numbered copies of documents seized.

Motion granted in part and denied in part.

West Headnotes

[1] KeyCite Notes 🔲

   **13** Action
     **13I** Grounds and Conditions Precedent
      **13k3** k. Statutory Rights of Action. <u>Most Cited Cases</u>

Federal statute criminalizing possession of pirate access devices did not create private right of action. <u>18 U.S.C.A. § 2512</u>.

[2] KeyCite Notes 🔲

   **170B** Federal Courts
     **170BVI** State Laws as Rules of Decision
      **170BVI(C)** Application to Particular Matters
       **170Bk422** Limitation Laws
        **170Bk424** k. Federally Created Rights. <u>Most Cited Cases</u>

Determining statute of limitations for activity under federal statute is governed by federal law.

entire record and the arguments of the parties, the Court enters the following Order.

**Background**

Plaintiff DirecTV, Inc. ("DirecTV") is a California company in the business of providing television programming to millions of subscribers in the United States through a digital satellite system. [FN1] DirecTV sells programming to customers and provides different levels of programming to different

350 F.Supp.2d 1048                                                                      Page 2 of 9



[3] KeyCite Notes

> 170B Federal Courts
>> 170BVI State Laws as Rules of Decision
>>> 170BVI(C) Application to Particular Matters
>>>> 170Bk422 Limitation Laws
>>>>> 170Bk424 k. Federally Created Rights. Most Cited Cases

When Congress fails to supply statute of limitations for federal cause of action, most analogous state statute of limitations generally applies; however, when application of state limitations period would stymie policies underlying federal cause of action in question, court may look to limitations period provided by analogous federal law which is more in harmony with objectives of that cause of action.



[4] KeyCite Notes

> 170B Federal Courts
>> 170BVI State Laws as Rules of Decision
>>> 170BVI(C) Application to Particular Matters
>>>> 170Bk422 Limitation Laws
>>>>> 170Bk424 k. Federally Created Rights. Most Cited Cases

California-based satellite television provider's Federal Communications Act (FCA) suit against Georgia buyer of "pirate access" devices was governed by limitations period applicable to actions brought under Georgia statute prohibiting theft of telecommunications services, rather than by Copyright Act's limitations period; state statute was analogous to FCA's anti-piracy provisions and consistent with federal substantive law, and using limitations period governing it would not overly burden practicalities of FCA suit. 17 U.S.C.A. § 507(b); Communications Act of 1934, § 705(a), (e)(4), as amended, 47 U.S.C.A. § 605(a), (e)(4); West's Ga.Code Ann. §§ 9-3-31, 9-3-32, 46-5-2.



[5] KeyCite Notes

> 241 Limitation of Actions
>> 241II Computation of Period of Limitation
>>> 241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
>>>> 241k95 Ignorance of Cause of Action
>>>>> 241k95(3) k. Nature of Harm or Damage, In General. Most Cited Cases

Limitations period for satellite television provider's action against buyer of "pirate access" devices, alleging unauthorized interception of electronic communications in violation of Wiretap Act, was not tolled between date when provider executed writ of seizure at seller's premises, seizing business records evidencing sales of devices, and time when provider received bates-stamped, numbered copies of documents seized, regardless of fact that large amount of records necessitated organization and processing; records seized gave provider reasonable opportunity to discover violation, which was controlling criterion. 18 U.S.C.A. §§ 2511(1), 2520(e).

**\*1049** Robin L. Gentry, Needle & Rosenberg, Atlanta, GA, Mark Edwin Henderson, David C. Holloway, Russell Adam Korn, Michael I. Krause, Jerry Chieh Liu, William Franklin Long, III, Sutherland Asbill & Brennan, Atlanta, GA, for DirecTV, Inc., Plaintiff.

Counts I and II of Plaintiff's Complaint arise under the FCA, 47 U.S.C. § 605. Defendant's *pro se* Motion to Dismiss does not specifically address the individual counts in Plaintiff's Complaint but generally asserts that the statute of limitations for Plaintiff's actions is 18 U.S.C. § 2520(e) and therefore the Court should dismiss Plaintiff's Complaint with prejudice. As to the § 605 claims, Plaintiff responds that the statute of limitations for 47 U.S.C. § 605(e)(4) is the three year statute of limitations of the Copyright Act, 17 U.S.C. § 507(b), and so the Complaint was timely filed.

[2]  [3]  In order to determine whether Plaintiff's § 605 claims were timely filed, the Court must first determine the applicable statute of limitations. Determining the statute of limitations for activity under a federal statute is governed by federal law. *Kingvision Pay-Per-View, Corp. v. 898 Belmont, Inc.*, 366 F.3d 217, 220 (3d Cir.2004). The FCA does not provide a statute of limitations for actions under 47 U.S.C. § 605. When Congress fails to supply a statute of limitations for a federal cause of action, the courts "have generally concluded that Congress intended that the courts apply the most closely analogous statute of limitations under state law." *United Paperworks Int'l Local # 395 v. ITT Rayonier, Inc.*, 931 F.2d 832, 834 (11th Cir.1991) (quoting *Reed v. United Transp. Union*, 488 U.S. 319, 323, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989)). The Supreme Court has made it clear that state statutes are the "lender of first resort" and this practice is "longstanding" and "settled." *North Star Steel Co. v. Thomas*, 515 U.S. 29, 34, 115 S.Ct. 1927, 132 L.Ed.2d 27 (1995). "Since 1830, 'state statutes have repeatedly supplied the periods of limitations for federal causes of action' when federal legislation made no provision.' " *Id.* at 33-34, 115 S.Ct. 1927 (quoting *Automobile Workers v. Hoosier Cardinal Corp.*, 383 U.S. 696, 703-04, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966)). Moreover, it is appropriate and realistic to presume that Congress was familiar with this precedent and expected its enactments to be interpreted in conformity with it. *North Star Steel*, 515 U.S. at 34, 115 S.Ct. 1927.

The Supreme Court has recognized, however that "[s]tate legislatures do not devise their limitations periods with national interests in mind, and it is the duty of the federal courts to assure that the importation of state law will not frustrate or interfere with the implementation of **\*1052** national policies." *Occidental Life Ins. Co. v. E.E.O.C.*, 432 U.S. 355, 367, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977). Therefore, where application of the state limitations period would stymie the policies underlying the federal cause of action, the court may look to a limitations period provided by an analogous federal law which is more in harmony with the objectives of the cause of action. *North Star Steel*, 515 U.S. at 34, 115 S.Ct. 1927. The reference to federal law, however, is the exception and the court will "decline to apply a state limitations period only when a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of the litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking." *Id.* (internal quotations omitted); *see United Paperworks Int'l*, 931 F.2d at 835. [FN2]

> FN2. Another exception recognized by the Supreme Court but not applicable in this case is provided by 28 U.S.C. § 1658 (1988), which
>
> provides a general four-year statute of limitations for federal statutes passed after December 1, 1990 that do not contain their own limitations period. *See North Star Steel*, 515 U.S. at 34, 115 S.Ct. 1927.

[4]  Here, the parties failed to fully address the question of the appropriate statute of limitations. Plaintiff contends that the three-year statute of limitations found in the Copyright Act applies to its claims under § 605. By contrast, broadly construing Defendant's *pro se* motion, he argues for the application of the two-year statute of limitations found in the Wiretap Act. This Court's own review of the applicable caselaw suggests that both parties' arguments find some support in the cases. *Compare Prostar v. Massachi*, 239 F.3d 669, 677 (5th Cir.2001) (applying three-year federal Copyright Act limitations period to claims under § 605); *Nat'l Satellite Sports, Inc. v. Time Warner Entm't Co.*, 255 F.Supp.2d 307, 314 (S.D.N.Y.2003) (same); *DirecTV v. Brady*, No. A 03-1450, 2004

WL 1752853, at *3 (E.D.La. Aug.4, 2004) (same) with, _DirecTV v. Johnson,_ No. 03 C 8504, 2004 WL 2011392, at *3 (adopting two-year statute of limitations from Wiretap Act to § 605 claims). It appears to the Court, however, that the parties have skipped over the primary inquiry by going directly to a federal law analogy for the applicable statute of limitations. See _North Star Steel,_ 515 U.S. at 34, 115 S.Ct. 1927 (stating that state statutes are the "lender of first resort").
Prior to considering the applicability of a federal law limitations period, the Court must first determine whether state law provides an appropriate analogous statute. _North Star Steel,_ 515 U.S. at 34, 115 S.Ct. 1927; _Kingvision,_ 366 F.3d at 221 ("If there is an analogous state limitations period, absent any impediment of implementation of national policies if that state period is applied, courts are not required to examine federal limitations periods.") The Court declines to follow the parties' suggestions that a federal statute of limitations is appropriate because the Court finds that Georgia law lends an appropriate state statute of limitations that is both consistent with federal substantive law and would not have an overly burdensome effect on the practicalities of litigation. See _Harrison v. Digital Health Plan,_ 183 F.3d 1235, 1239 (11th Cir.1999) (applying state statute of limitations to ERISA claims and noting that Georgia was the forum state and looking to Georgia law for the most analogous state law).
The Supreme Court has yet to consider the question of the statute of limitations for claims brought under 47 U.S.C. § 605. The two Circuit Courts of Appeal that have considered the question have reached different results under similar facts. Both ***1053** Court of Appeals cases involved the unauthorized broadcast of a boxing match. The first to consider the question was the Fifth Circuit in _Prostar v. Massachi,_ 239 F.3d 669 (5th Cir.2001). In _Prostar,_ the Fifth Circuit found that the closest state law in Louisiana was for the tort of conversion which provided for a one-year statute of limitations. _Id._ at 675. In holding that the three-year limitations period of the Copyright Act provided a "closer fit" than conversion, _id._ at 677, the court emphasized the "multi-state nature" of actions brought under the FCA and noted that cable broadcasts are routinely conducted on a national and international scale. _Id._ at 676. Additionally, the Fifth Circuit emphasized the uniformity that would result from the application of federal law and stated that application of state conversion law would result in widely varying limitations periods. _Id._ The court stated that application of a single federal standard would eliminate these practical difficulties and would facilitate resolution of the national problems addressed by the FCA. _Id._ at 677.
By contrast, the Third Circuit in _Kingvision Pay-Per-View, Corp. v. 898 Belmont, Inc.,_ 366 F.3d 217 (3d Cir.2004), distinguished the _Prostar_ decision and declined to apply the federal law limitations period. First, the Third Circuit noted that Pennsylvania's piracy statute, 18 Pa. Const. Stat. Ann. § 910, provided a closer state law analogy than did the general conversion law at issue in _Prostar. Id._ at 223-24. The court also rejected the Fifth Circuit's emphasis on uniformity as it related to the length of the limitations periods and noted that the "national concerns of the cable industry are relevant only insofar as they are embodied in the FCA." _Id._ at 224. Finally, the court held that the state piracy laws provided a closer analogy than the Copyright Act. _Id._ at 225.
The Court is persuaded that applying the proper analysis as articulated by the Supreme Court in _North Star Steeli.e.,_ applying the general rule that the lender of first resort is state law. Georgia law provides an appropriate state law analogy and the Court need not look to federal law. In selecting the state limitations period most relevant to the federal cause of action, the court must first characterize the essential nature of the plaintiff's claim. _Harrison,_ 183 F.3d at 1239. The FCA was created "[f]or the purpose of regulating interstate and foreign commerce in communication ... so as to make available, so far as possible, to all the people of the United States ... a rapid, efficient ... communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151. Specifically, Congress passed § 605 to prevent unauthorized interception of cable transmissions, including interception through unauthorized use of decoding devices. _Kingvision,_ 366 F.3d at 225. Similarly, Georgia law provides for civil and criminal penalties for theft of telecommunication services. O.C.G.A. § 46-5-2. [FN3] Under that code section

FN3.

"Telecommunication service" means any service provided for a charge or compensation to facilitate the origination, transmission, emission, or reception of signs, signals, data, writings, images, sounds, or intelligence of any nature by telephone or telephone service,

including public pay telephones, or cable television service (CATV), including cellular or other wireless telephones, wire, radio, electromagnetic, photoelectronic, or photo-optical system.

O.C.G.A. § 46-5-3(a)(1). The law was amended in 1996 to broaden its scope. The law now provides protection to telephone, cable television, cellular and other wireless telephone services. See Review of Selected 1996 Georgia Legislation, 13 Ga. St. U.L.Rev. 290 (November 1996).

*1054 [i]t shall be unlawful for any person to avoid or attempt to avoid or to cause another to avoid the lawful charges, in whole or in part, for any telecommunication service ... or for the transmission of a message, signal, or other communication by telephone or telegraph or over telecommunication or telegraph facilities by the use of any fraudulent scheme, means, or method, or by the use of any unlawful telecommunication device ... or other mechanical, electric, or electronic device O.C.G.A. § 46-5-2(a). Section (b)(4) provides for a civil cause of action and states that Any person, corporation, or other entity aggrieved by a violation of this Code section may, in a civil action in any court of competent jurisdiction, obtain appropriate relief, including preliminary and other equitable or declaratory relief, compensatory and punitive damages, reasonable investigation expenses, cost of suit, and reasonable attorney's fees.
The statute of limitations for this code section is four years. [FN4] The Georgia code section, though not identical to the federal law, is substantially similar in substance to § 605. For instance, the Georgia statute provides for appropriate relief in a civil action including "preliminary and other equitable or declaratory relief, compensatory and punitive damages, reasonable investigation expenses, cost of suit and reasonable attorney's fees." O.C.G.A. § 46-5-2(b)(4). Likewise, § 605 provides for injunctive relief, damages, costs and attorneys' fees. 47 U.S.C. § 605(e)(3)(B). Both the Georgia law and the FCA provide for criminal penalties. Compare O.C.G.A. § 46-5-2(b)(1)-(3) with, 47 U.S.C. § 605(e)(1)-(3). Additionally, both statutes provide for increased penalties for the willful violations for the purposes of commercial advantage or financial gain. Compare O.C.G.A. § 46- 5-2(b) (5)(D) with, 47 U.S.C. § 605(e)(3)(C)(ii).

> FN4. Georgia law provides a four-year limitations period for
>
> "[a]ctions for injuries to personalty." O.C.G.A. § 9-3-31. Here, Plaintiff alleges that Defendant has injured the property interest that it holds in its programming and the revenue that it receives from selling that programming. Likewise, "[a]ctions for the recovery of personal property, or for damages for the conversion or destruction of the same" also provides for a four-year limitations period. O.C.G.A. § 9-3-32.

The Georgia law is parallel in substance and form to the FCA. It is not at odds with the purpose or operation of federal substantive law. North Star Steel, 515 U.S. at 34, 115 S.Ct. 1927. Moreover, the Court is not persuaded by the need for uniformity as discussed in the Fifth Circuit's decision in Prostar, but rather finds the Third Circuit's decision in Kingvision the more compelling argument. In rejecting the Fifth Circuit's uniformity analysis, the Third Circuit recounted three points that should be considered in determining whether the court should apply the exception to the "general rule" in favor of state law as enunciated in North Star Steel, Kingvision, 366 F.3d at 222. First, the Third Circuit emphasized that a general preference for uniformity, even to avoid forum shopping, was not a sufficient reason to apply federal law. Id.; see North Star Steel, 515 U.S. at 36, 115 S.Ct. 1927. Second, the court stated that the desire to unify the limitations periods of federal laws with similar purposes is not a sufficient reason to apply the exception. Id. Finally, the court recognized a difference between the uniformity in construing the substantive elements of a statute for purposes of determining what type of state law is most analogous versus the uniformity in the result, i.e. the length of the limitations period. Id.

*1055 Moreover, insofar as the Fifth Circuit relied on the "multi-state nature" of the violations, the Court agrees with the Third Circuit that "violations of the Cable Act ... are particular acts which are pursued in the locations where they occur." *Kingvision,* 366 F.3d at 224. In *Prostar,* the Fifth Circuit discussed the Supreme Court's decision in *Agency Holding Corp. v. Malley-Duff & Associates, Inc.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). In *Malley-Duff,* the Court applied the four-year statute of limitations from the Clayton Act to federal RICO claims rather than individual state laws. The Court emphasized the practicalities of RICO litigation and recognized that RICO cases commonly involve interstate transactions and that predicate acts may often occur in several states. *Id.* at 154, 107 S.Ct. 2759. This kind of "multi-state" case, which may involve actions in multiple states in a single cause of action against a single defendant, is far different from the case at bar. For instance, while it may be true that cable companies are "national" in that they do business in multiple states, an individual suit against an individual defendant, as in this case, does not present the problem of competing state statutes of limitations as contemplated by the *Malley-Duff* Court. See 483 U.S. at 154, 107 S.Ct. 2759. Rather, the targeted piracy alleged in the Complaint is alleged to have taken place in a single location by a single defendant in a single state.

A suit by a California Plaintiff against a Georgia Defendant is not unusual or rare in federal court and does not present any special circumstance that would undermine the implementation of the FCA or prevent a plaintiff from pursuing a claim under the FCA. The Supreme Court has relied on the practical difficulties of litigation to apply a federal statute of limitations in the limited circumstance where a plaintiff is effectively prohibited from enforcing rights guaranteed under federal law. *See Malley-Duff,* 483 U.S. at 153-54, 107 S.Ct. 2759 (applying federal limitations period where multiple state statutes of limitations could govern a single claim); *DelCostello v. Int'l Bhd. of Teamsters,* 462 U.S. 151, 166, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) (applying federal limitations period where ninety-day state limitations period would fail to provide an aggrieved employee with a satisfactory opportunity to vindicate his rights).

This Court declines to apply the exception simply for the purpose of streamlining a plaintiff's litigation efforts across the country. While it may seem attractive for federal courts to seek out an analogous federal law and apply it uniformly, that would be in derogation of binding Supreme Court precedent. *North Star Steel,* 515 U.S. at 34, 115 S.Ct. 1927. Moreover, the fact that the limitations period will vary from state to state is not sufficient reason to apply the exception. If that were the case, then the exception would inevitably swallow the rule. "[T]he practice of adopting state statutes of limitations for federal causes of action can result in different limitations periods in different States for the same federal cause of action, and [ ] some plaintiffs will canvass the variations and shop around for a forum. But these are just the costs of the rule itself." *Id.* at 36, 115 S.Ct. 1927.

Therefore, the Court sees no reason to examine federal law for an analogy because state law provides an analogous cause of action. Under Georgia law, O.C.G.A. § 46-5-2, the statute of limitations for a cause of action under 47 U.S.C. § 605 is four years. Plaintiff filed its cause of action within this time period. Accordingly, as to Counts I and II, Defendant's Motion to Dismiss is hereby **DENIED.**

*1056 **III. Count III**

[5]    Plaintiff's Count III asserts a claim for unauthorized interception of electronic communications in violation of 18 U.S.C. § 2511(1). Defendant contends that the statute of limitations commenced when Plaintiff seized records from EQ Stuff, Inc. on January 24, 2002. Since the Complaint in this case was not filed until January 28, 2004, Defendant argues that Plaintiff's Complaint was filed out of the statute of limitations and should be dismissed. Plaintiff responds that the Court should find that the statute of limitations did not begin to run until January 28, 2004, because that is the date on which Plaintiffs received the bates stamped, numbered copies of the documents that were seized on January 24, 2002. Plaintiff does not dispute the legal standard for when the statute of limitations begins, but argues that because of the complex nature of the evidence and the large amount of records that it received from the seizure on January 24, 2004, the statute of limitations should not begin until the records seized had been through some initial processing.

The statute of limitations for the Wiretap Act is found in 18 U.S.C. § 2520(e) and provides that "[a] civil action under this section may not be commenced later than two years after the date upon which the claimant first has a reasonable opportunity to discover the violation." 18 U.S.C. § 2520(e). "Like many statutes of limitation, [ § 2520(e) ] does not require the claimant to have actual knowledge of the violation; it demands only that the claimant have had a reasonable opportunity to discover it." *Davis v. Zirkelbach,* 149 F.3d 614, 618 (7th Cir.1998); *see Andes v. Knox,* 905 F.2d 188, 189 (8th

Cir.1990) ("[T]he cause of action accrues when the claimant has a reasonable opportunity to discover the violation, not when she discovers the true identity of the violator or all of the violators.") The courts that have considered the question of when the statute of limitations should begin on these facts have relied on different dates to start the statute of limitations. In _DirecTV v. Thomas,_ 329 F.Supp.2d 949 (E.D.Mich,2004), the defendant moved to dismiss the plaintiff's complaint on statute of limitations grounds. There, the plaintiff raided a shipping facility used by a manufacturer of illegal piracy equipment on May 25, 2001 and recovered business and financial records. The plaintiff did not receive records that disclosed the defendant's name until September 14, 2001, when the operator of the seized company turned over additional business records. _Id._ at 951. The _Thomas_ court held that the statute of limitations began to run on September 14, 2001 when the plaintiff received records which implicated the defendant. _See also DirecTV v. Johnson,_ No. 03 C 8504, 2004 WL 2011392, at *3 (N.D.Ill. Sept.3, 2004) (holding that statute of limitations began to run when the plaintiff received records which implicated the defendant).

By contrast, in another case involving the same series of seizures and records, the court held that the plaintiff had a reasonable opportunity to discover the alleged violations on the date on which the writs of seizure were executed, May 25, 2001, which then led to the subsequent turnover of the records. _DirecTV v. Brady,_ No. A. 03-1450, 2004 WL 1752853, at *7 (E.D.La. Aug. 4, 2004). That court stated that the date the records were turned over was irrelevant because the significant date was that the defendant had purchased a device from the manufacturer and the date of the raid which led to the discovery of the defendant's alleged violation was May 25, 2001. _Id._ at *7.

**\*1057** Under the facts of this case, however, the decisions in _Thomas_ and _Brady_ are in accord. Here, it is undisputed that the seizure of records which led to the discovery of Defendant took place on January 24, 2002. Plaintiff is not arguing that there was any intervening raid, seizure or turnover of documents or business records or that the seizure on January 24, 2002, did not provide records that implicated Defendant. Plaintiff argues merely that after the seizure of the records on January 24, 2002, the Court should toll the start of the statute of limitations to permit Plaintiffs time to organize the seized records, make copies and number them with bates stamps.

Plaintiff has cited no authority, and the Court has found none, that would provide for the tolling of the statute of limitations under § 2520(e) to permit Plaintiff time to organize, copy and bates stamp the documents it received. Section 2520(e) commences the statute of limitations when a "claimant first has a _reasonable opportunity_ to discover the violation." Plaintiff first had such an opportunity when it executed the writ of seizure on EQ Stuff on January 24, 2002. Notably, Plaintiff argues that it acted diligently in preparing the documents and had received them back by January 28, 2004, four days after the seizure. Therefore, it appears that Plaintiff had the remainder of the following two years to discover Defendant's identity and bring suit against him. Neither the complex nature of the evidence, the volume of the records, nor the "realities of the real world" provide Plaintiffs additional time where the plain language of the statute specifies otherwise. Where the records seized provide the plaintiff with a reasonable opportunity to discover the violation, the mere fact that the plaintiff did not avail itself of that opportunity in a timely fashion will not toll the statute of limitations. Since Plaintiff did not file suit until January 28, 2004 and the statute of limitations on Plaintiff's claim under 47 U.S.C. § 2511 ran on January 24, 2004, the Court finds that Plaintiff's claim is time-barred. Accordingly, Count III of Plaintiff's Complaint is hereby DISMISSED.

## Conclusion

Defendant's Motion to Dismiss [8-1] is **GRANTED in part and DENIED in part**. Defendant's Motion is **GRANTED** as to Counts III and IV. Counts III and IV are hereby **DISMISSED**. Defendant's Motion is **DENIED** as to Counts I and II. It appears the Court that discovery in this case closed on November 27, 2004. Therefore, the Parties are **DIRECTED** to file dispositive motions or a consolidated pre-trial order within twenty (20) days of the date of entry of this Order.

N.D.Ga.,2004.
DirecTV, Inc. v. Wright
350 F.Supp.2d 1048

## Motions, Pleadings and Filings (Back to top)

• 2004 WL 2563502 (Trial Motion, Memorandum and Affidavit) Plaintiff Directv, Inc.'s Response in Opposition to Defendant Wright's Motion to Dismiss (Aug. 06, 2004)
• 2004 WL 2563501 (Trial Pleading) Defendant John Wright's Answer and Affirmative Defenses (Jun. 30, 2004)

- 2004 WL 2563500 (Trial Pleading) Complaint for Compensatory, Statutory and Other Damages, and for Injunctive Relief (Jan. 28, 2004)
- 1:04CV00242 (Docket) (Jan. 28, 2004)

**END OF DOCUMENT**

West Reporter Image (PDF)

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.